**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

TASHA C.,

                Plaintiff,

    v.

ANDREW M. SAUL,
Acting Commissioner of
Social Security,

                Defendant.

Case No. 18-cv-4677

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Tasha C.[1] seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits. Tasha asks the Court to reverse and remand the ALJ's decision, and the Commissioner moves for its affirmance. For the reasons set forth below, the ALJ's decision is reversed and this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

Tasha suffered a workplace injury in March 2009, which led to Tasha undergoing rotator cuff surgery in October 2009 and anterior spinal discectomy and fusion surgery in May 2011. (R. 367-70, 419, 732). In July 2012, Tasha left her job as a machine and line operator due to worsening back pain. *Id.* at 44-46. Near the time of her exit, she presented to pain specialist, Dr. Jalaja Piska, with intense low back pain, numbness, tingling and weakness. *Id.* at 398. Tasha further reported difficulties with sleeping, walking, standing, and getting up from a sitting position.

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

*Id.* Additionally, Tasha informed Dr. Piska that it was difficult for Tasha to stand, walk, or sit for long periods of time. *Id.*

Tasha's subsequent medical record is immense and details Tasha undergoing surgery, physical therapy, and more in response to a wide array of ailments. For instance, the treatment records describe Tasha's February 2013 left knee surgery after a meniscus tear, (R. 968, 971), as well as several emergency room visits for knee, neck, shoulder, and back pain in 2013. *See, e.g., id.* at 1073, 1094, 1184, and 1210. According to her treatment records, Tasha underwent a series of left knee injections in June 2014, *id.* at 977, had corrective surgery on her right shoulder in July 2015, *id.* at 1392-1393, and received epidural steroid injections for cervical radiculopathy in February 2017. *Id.* at 1548. Tasha participated in physical therapy for her left knee and right shoulder in the fall of 2015, *id.* at 1655, for cervical spine and shoulder pain over the span of several months in 2016, and for cervical spine pain in early 2017. *Id.* at 1799, 1874, 1890, 1894.

The record is varied on the success of these treatments. As an example, Tasha was discharged from physical therapy in November 2016 with Physical Therapist Wendy Jorjorian stating that Tasha had a full range of motion in her neck and shoulders, and that her pain and radicular symptoms had been abolished. (R. 1890). Yet only a few months later, Tasha began physical therapy again for cervical spine pain, reporting that she was experiencing anywhere from 3/10 to 10/10 pain and numbness in her right hand. *Id.* at 1894, 1907. Following that report, Tasha received epidural steroid injections for cervical radiculopathy. *Id.* at 1548.

In the midst of these medical treatments, Tasha attempted to work. At her hearing before the ALJ, Tasha testified that she started numerous jobs that lasted only a couple of days to a couple of weeks, due to her injuries. According to Tasha, her job as an assembly line packer in 2015 ended after a couple of days because she could not remain standing. (R. 44). Tasha testified that

in 2016 she started two machine operating jobs that ended prematurely due to the pain she was experiencing in her legs and because of her knee injuries. *Id.* at 42-43. In December 2016, Tasha obtained a temporary assignment stocking shelves for a department store, which lasted approximately ten days. *Id.* at 39-41.

Tasha filed applications for disability benefits in September 2014, alleging disability beginning July 10, 2012. (R. 233). Tasha's claim was initially denied on December 15, 2014, and upon reconsideration on April 8, 2015. *Id*. at 116-19, 121-25. Upon Tasha's written request for a hearing, she appeared before ALJ Diane S. Davis on two occasions. At the first hearing, on September 21, 2016, the ALJ continued the hearing because Tasha was waiting on medical records from the 2015 to 2016 time period. *Id.* at 80-83. Dr. Ashok G. Jilhewar, who appeared as a medical expert, testified that he could not state his opinion without reviewing the missing records. *Id.* at 82-83. At the second hearing, on February 17, 2017, the ALJ heard testimony from Tasha and the vocational expert, Robert Burkins. *Id.* at 33. However, no medical expert appeared or presented testimony at the second hearing.

On June 28, 2017, the ALJ issued a decision denying Tasha's application for disability benefits. (R. 23). The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520. At step one, the ALJ found that Tasha had not engaged in substantial gainful activity since July 10, 2012, the alleged onset date. (R. 16). At step two, the ALJ found that Tasha had the severe impairments of status-post lumbar fusion, right shoulder arthropathy, with two repairs to rotator cuff, and degenerative joint disease of the left knee, status-post left knee medial meniscus repair. *Id.* at 17. At step three, the ALJ determined that Tasha did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). *Id.* at 17-18.

The ALJ then concluded that Tasha retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she:

> can lift and/or carry twenty pounds occasionally, and ten pounds frequently. She can stand and/or walk for four hours total in an eight-hour workday with normal breaks and sit for about six hours in an eight-hour workday with normal breaks. She can occasionally stoop, kneel, crouch, crawl, and climb. She can frequently reach in all directions with the right, dominant upper extremity.

(R. 18). Based on this RFC, the ALJ determined at step four that Tasha could not perform her past relevant work as a machine feeder. *Id.* at 21-22. At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Tasha could perform. *Id.* at 22-23. Specifically, the ALJ found Tasha could work as an injection mold machine tender or sorter. *Id.* at 22. Because of this determination, the ALJ found that Tasha was not disabled. *Id.* at 23. The Appeals Council denied Tasha's request for review on May 4, 2018, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## II. DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt.

P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Although this standard is generous, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id.*

The ALJ found Tasha not disabled at step five of the sequential analysis because she retains the RFC to perform other work that exists in significant numbers in the national economy. Tasha argues that the ALJ committed several reversible errors. First, Tasha asserts that the ALJ relied upon improper inferences and engaged in cherry picking to reject her symptom allegations. Doc. [13] at 7-11. Second, Tasha states that the ALJ improperly weighed the medical opinions. *Id.* at 11-12. Third, Tasha contends that the ALJ tailored the RFC assessment to "eke out a finding" that Tasha is not disabled. *Id.* at 12-13. Finally, Tasha argues that the ALJ erroneously accepted the

vocational expert's testimony regarding available jobs that Tasha would be able to perform. *Id.* at 13-14.

The Court finds that the ALJ failed to properly weigh the medical opinions in this case, mischaracterized the record, and failed to properly develop the medical evidence. These errors, in combination, are not harmless. Accordingly, for the reasons discussed below, the ALJ's decision must be reversed.[2]

### A.    Weighing of Medical Opinions

Tasha argues that the ALJ "virtually ignored" the regulatory factors in weighing the medical opinions of treating and non-treating physicians. Doc. [13] at 11. According to Tasha, the ALJ "simply assigned little or no weight to each professional's opinion, without any discussion of the regulatory factors, and seemingly without regard to what the opinion was." *Id.*

### 1.    Applicable Law

The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874, 874 n.1 (7th Cir. 2018) (for claims filed before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record."). An ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotation marks and citations omitted); *see also Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018). Those reasons must be "supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself,

---

[2] Because these errors requires remand, the Court does not address Tasha's other arguments.

suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citation omitted); *see* 20 C.F.R. § 404.1527(c).

### 2.    The ALJ Failed to Address the Regulatory Factors

The medical record in this case is massive. It spans at least eight years of treatment records concerning Tasha's numerous impairments, which include shoulder, knee, back, and neck injuries. By this Court's conservative estimate, Tasha was treated by at least eleven physicians during the relevant time period (2012-2017). (R. 822-825, 968-1031, 1310-1321, 1335-1338, 1345-1358, 1381-1390, 1421, 1434, 1464-1471, 1501-1518, 1548-1550, 1960). Despite this expansive data set, the ALJ's weighing of medical opinions was limited to just six sentences, and touched on only four treating physician opinions. *Id.* at 20-21. As the Commissioner concedes, "the ALJ could have, and perhaps should have, provided more details regarding her assessment of the medical opinions[.]" Doc. [23] at 7.

The ALJ began her medical opinion analysis with the state agency physicians, Dr. Reynaldo Gotanco and Dr. Mila Bacalla. (R. 20). The ALJ assigned "partial weight" to the state agents' opinions, who found Tasha capable of performing a significant range of light work, because the ALJ "granted some degree of weight to the claimant's knee surgeries." *Id.*

Next, the ALJ assigned "some weight" to Dr. Jalaja V. Piska. (R. 20). According to the ALJ, Dr. Piska was Tasha's pain management provider who found that Tasha "remained capable of performing light work." *Id.* The ALJ explained her weight assignment of Dr. Piska by saying,

"while the undersigned overall agrees with this opinion, this provider failed to indicate to what degree the claimant would be limited to this level." *Id.*

The ALJ then assigned "partial weight" to the opinion of Dr. Martin Hall. The ALJ characterized Dr. Hall's opinion as stating Tasha "remains capable of returning to work." (R. 21). In explanation for assigning only partial weight, the ALJ stated "while the undersigned agrees that the claimant is capable of performing work, notably, this provider failed to indicate or specify to what degree the claimant could return to work or her functional capabilities." *Id.*

The ALJ subsequently mentioned "the opinion of the claimant's physical therapy work conditioning program that found that she could return to work at the medium level . . . ." (R. 21). The ALJ assigned "some weight" to that opinion, reasoning that the medium level was "not supported by [Tasha's] intervening injuries." *Id.*

The ALJ assigned only "limited weight" to Raymond Hines III, PA-C and Dr. Patrick Sweeney, who the ALJ found to opine that Tasha "could return to work." (R. 21). The ALJ's reason for giving limited weight to that opinion was that the providers "failed to specify to what degree the claimant could perform work." *Id.*

Finally, the ALJ assigned no weight to the opinion of Dr. William Imlach, "who found that the claimant was limited to lifting less than ten pounds, as noticeably, this opinion was rendered before the claimant's onset date and she managed to return to work, well after the date this opinion was rendered." (R. 21).

Because the ALJ did not give controlling weight to any of the preceding treating physician opinions, she had to "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561; *see* 20 C.F.R.

§ 404.1527(c). An ALJ's failure to explicitly apply the checklist can provide a basis for remand. *See, e.g.*, *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) ("in addition to summarizing [the treating physician's] visits and describing their treatment notes, the ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to their opinions"); *Campbell*, 627 F.3d at 308 ("the decision does not explicitly address the checklist of factors as applied to the medical opinion evidence."); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (remanding where the ALJ's decision "said nothing regarding this required checklist of factors."); *Wallace v. Colvin*, 193 F. Supp. 3d 939, 947 (N.D. Ill. 2016) ("the ALJ did not explicitly apply the checklist. In this Court's view, that failure alone is a ground for a remand.").

In this case, the ALJ did not appropriately address each of the checklist's factors in weighing the opinions of Drs. Piska, Hall, Sweeney, and Imlach. In fact, aside from the ALJ's acknowledgment that Dr. Piska's specialty is pain management, (R. 20), the ALJ neglected to touch on any of the checklist factors for the treating physicians discussed in her assessment of their opinions.

The ALJ failed to consider the nature and extent of Tasha's treatment relationships with Drs. Piska, Hall, Sweeney, and Imlach. Under 20 CFR § 404.1527(c)(2)(ii), the ALJ "will look at" the treatment that the treating source provided and the type of examinations and testing that the treating source has performed or ordered from specialists. The regulation explains by example that an ophthalmologist who merely *notices* neck pain during eye examinations will be given less weight than that of another physician who actually treated the patient's neck pain. *Id.* Here, in weighing the treating physicians' opinions, the ALJ did not mention any techniques or exams conducted by Drs. Piska, Hall, Sweeney, and Imlach. Without discussion or comment by the ALJ on these matters, the Court cannot determine whether the ALJ accounted for the nature or extent

of Tasha's treatment relationships with Drs. Piska, Hall, Sweeney, and Imlach when weighing their opinions.

Nor did the ALJ expressly consider the specialty, or frequency of treatment, when weighing the opinions of Tasha's treating physicians. While the ALJ characterized Dr. Piska as Tasha's "pain management provider," (R. 20), the ALJ did not discuss the specialties of Drs. Hall, Sweeney, or Imlach. The ALJ likewise failed to make any comments on the frequency with which Tasha was treated by Drs. Piska, Hall, Sweeney, and Imlach. The ALJ therefore failed to minimally address the factors of specialty and frequency.

The ALJ also failed to discuss the supportability and consistency of the opinions of Drs. Piska, Hall, Sweeney, and Imlach in her analysis of those opinions. *See* 20 CFR § 404.1527(c)(3)-(4). The regulations explain that supportability encompasses the preference given to a medical source that "presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings . . . ." 20 CFR § 404.1527(c)(3). Whereas consistency is directed at the fit of the medical source's opinion in the context of the record as a whole. 20 CFR § 404.1527(c)(4). In this case, the ALJ did not address supportability or consistency when weighing the opinions of Drs. Piska, Hall, Sweeney, and Imlach.

The Commissioner claims that the ALJ declined to give the opinions of Drs. Piska, Hall, Sweeney, and Imlach controlling weight but "assigned them some or partial weight because they were consistent with the evidence." Doc. [23] at 7. The Court cannot find any discussion of consistency in the ALJ's weighing of the treating physicians' opinions. At most, the ALJ states that she "agrees" with the opinions of Drs. Piska and Hall. (R. 20-21). It is quite a stretch to say that an ALJ's bald statement that she agrees with an opinion constitutes an articulation of consistency. The Commissioner cannot retroactively add factors to the ALJ's analysis of treating

physicians. *See Wollman v. Colvin*, No. 13-CV-037-CJP, 2013 WL 5700975, at *7 (S.D. Ill. Oct. 18, 2013) ("Simply put, this Court is required to review the ALJ's decision based on what the ALJ actually said, and not on a reinterpretation of the ALJ's decision based on the Commissioner's after-the-fact reweighing of the evidence.").

The ALJ's actual analysis in this case appears limited to: (1) interpreting the treating physicians as opining that Tasha could return to work; and (2) giving the opinions less than controlling weight because the physicians were not specific enough about Tasha's functional capabilities. With respect to Dr. Imlach's opinion, she dismissed it for being outside of the relevant time period. The failure to properly apply the checklist factors is error.

### 3.    The ALJ Mischaracterized the Record

In addition to the ALJ's neglect of the regulatory factors under 20 C.F.R. § 404.1527(c), the ALJ mischaracterized the record. To begin, the ALJ stated that Dr. Piska "found that the claimant remained capable of performing light work." (R. 20). In support of that assessment, the ALJ cited to a June 4, 2012 treatment note from Dr. Piska. Dr. Piska's note does not contain any general conclusion as to Tasha's work capabilities. Rather, the note stated that Tasha was in a lot of pain and was, at the time, on "light duty":

> [Tasha] is here for evaluation and treatment of the pain . . . She has history of [ ] Back problems, Bulging discs and s/p Lumbar fusion . . . She continues to have pain and she is on light duty. Her pain is worse since she cannot take medications at work so she is in [a] lot of pain today.

*Id.* at 391. Therefore, contrary to the ALJ's assessment, Dr. Piska only noted that in June 2012 Tasha was on "light duty," not that she was capable of performing work at the light level. Tasha's reduced work status in June 2012 is not surprising, considering Tasha left her job at ACH Food Companies, Inc. a month later, once her back pain progressed. *Id.* at 44-46. Moreover, the June

2012 note, created a month before Tasha's onset date, is not helpful in determining Tasha's disability. *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (holding the ALJ made a "basic factual error" by justifying his finding in part on a doctor's assessment of claimant's lifting abilities which was made a year before the alleged onset date).

The Dr. Piska blunder was not the ALJ's only timing error in weighing the medical opinions. The ALJ was quick to toss away Dr. Imlach's opinion, who she said, "found that the claimant was limited to lifting less than ten pounds, as noticeably, this opinion was rendered before the claimant's onset date . . . ." (R. 21). Although the January 2010 lifting opinion cited by the ALJ did come well before Tasha's onset date, *id.* at 792, Dr. Imlach treated Tasha in 2015 and 2016 as well. *See, e.g.*, *id.* at 1346-58. For example, in September 2015 he examined Tasha and noted that Tasha was "limping on the right side" and had "some swelling in left knee and tenderness at the knee and lower back with motion." *Id.* 1352. Dr. Imlach further listed the following assessments in his note: lumbar radiculopathy, asthma, breast cyst, gastroesophageal reflux, status post rotator cuff surgery, post-laminectomy syndrome, and back muscle spasm. *Id.* In July 2016, Dr. Imlach ordered an MRI of Tasha's left shoulder, which was interpreted by Dr. Vincent Rowley as indicating "[r]otator cuff tendinopathy involving the supraspinatus and infraspinatus tendons with accompanying mild bursal surface fraying and focal partial thickness infraspinatus tear near the humeral insertion . . . ." *Id.* at 1346-47. Because the ALJ did not discuss these later medical records, nor the treating physician regulatory factors, in her assessment of Dr. Imlach, the Court cannot trace the ALJ's reasoning in assigning no weight to Dr. Imlach.

The ALJ, moreover, assigned "some weight" to a December 7, 2011 physical therapy opinion that Tasha could work at the medium level. (R. 21). "Some weight" is not particularly specific or helpful in understanding the weight assigned by the ALJ, *see Larson*, 615 F.3d at 751

(finding ALJ's statement that physician's opinion entitled to "some weight" unhelpful), so the Court cannot know how much weight was actually given to the physical therapy opinion. Yet, in contrast to the treating physicians whose opinions were not even weighed by the ALJ, it is clear that the ALJ gave credence to a December 7, 2011 assessment made by a non-doctor in connection with a physical therapy program. The Court is thus troubled by the ALJ's apparent preference for an opinion from a non-acceptable medical source, *see* SSR 06–03p, 2006 WL 2329939, at *2 (Aug. 9, 2006), which was made months before Tasha's onset date.

The ALJ mischaracterized Dr. Hall's opinion as well. According to the ALJ, Dr. Hall "opined that the claimant remains capable of returning to work . . . ." (R. 21). This assessment, too, misses the mark. Dr. Hall saw Tasha on four occasions from February 2016 to January 2017 in connection with her knee pain; he assessed Tasha's impairments as patellofemoral arthralgia of left knee, left medial knee pain, and patellofemoral arthralgia of right knee. *Id.* at 1464-1471. While it is true that Dr. Hall made comments indicating Tasha could return to work, *id.* at 1465, 1467, 1469, Dr. Hall explicitly stated early on in his treatment of Tasha that his opinion concerned Tasha's knee impairments: "Patient could work as far as her left knee is concerned. She has been treated by other doctors for a back issue and has not been seen for her back today." *Id.* at 1465. Dr. Hall's opinion was thus, at most, an opinion that Tasha's knees alone did not prevent her from returning to work. Dr. Hall did not conduct a physical RFC of Tasha, nor does it seem he had access to any of Tasha's medical records relating to her non-knee impairments. Had the ALJ assessed Dr. Hall pursuant to the regulatory factors, she might have properly construed Dr. Hall's opinion as being limited to Tasha's knee impairments.

The Commissioner attempts to save the ALJ's misstatements by rewriting her analysis. For instance, the Commissioner rewrites the ALJ's statement that Dr. Piska "found that the

claimant remained capable of performing light work," (R. 20), as "[t]he ALJ gave some weight to treating physician Jalaja V. Piska, M.D.'s indication that plaintiff was working at the light level in June 2012." Doc. [23] at 7. The Commissioner likewise reframes the ALJ's claim that Dr. Hall "opined that the claimant remains capable of returning to work," (R. 21), as the ALJ giving "partial weight to treating physician Martin R. Hall, M.D.'s opinion that plaintiff 'could work as far as her left knee is concerned.'" Doc. [23] at 7. Again, the Court must review the ALJ's decision based on what the ALJ actually said, and not the Commissioner's after-the-fact reinterpretation. *See Wollman*, 2013 WL 5700975, at *7.

In sum, the ALJ erred in her weighing of the medical opinions in this case. For the four treating physicians discussed, the ALJ did not give their opinions controlling weight, yet failed to address the regulatory factors under 20 C.F.R. § 404.1527(c). The ALJ's analysis further mischaracterized the record and demonstrated a lack of understanding as to the relevant time frame in this case. The ALJ's brief and inaccurate comments do not constitute "good reasons" for discounting the treating physicians' opinions. *Campbell*, 627 F.3d at 306. Because the ALJ's weighing of medical opinions "lacks evidentiary support" and "is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

### B. Failure to Develop the Medical Record

As part of her medical evidence argument, Tasha asserts that the ALJ failed to build a complete record, as required by SSR 96-5p. Doc. [13] at 11. Specifically, Tasha suggests that the ALJ should have recontacted her physicians and/or called a medical expert to testify, rather than "impermissibly play doctor and rely upon her own lay opinion" in evaluating Tasha's impairments. *Id.* at 11-12.

"Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (citation omitted). The ALJ has a duty to develop the medical record by requesting evidence from the claimant's medical sources. 20 C.F.R. § 404.1512(b). If the ALJ is unable to properly evaluate the medical evidence in the record, the regulations provide options for the ALJ to pursue, including requesting additional records, recontacting the treating physician, and ordering a consultative examination. *See* 20 C.F.R. § 404.1520b(b). However, the ALJ is not required to recontact the medical source, so long as the record "contain[s] adequate information for the ALJ to render a decision." *Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018); *see also Skinner v. Astrue*, 478 F.3d 836, 843-44 (7th Cir. 2007). An ALJ's decision to call a medical expert to testify is likewise discretionary, *see* 20 C.F.R. § 404.1513a(b)(2), and the obtaining of a medical expert is only required "when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Courts in this Circuit have thus held the ALJ was required to recontact a medical source or obtain the testimony of a medical expert after finding that the evidence was inadequate with respect to some aspect of the claimant's disability. *See Simms v. Astrue*, 599 F. Supp. 2d 988 (N.D. Ind. 2009) (holding the ALJ should have recontacted treating physician where ambiguity in treatment records created inadequacy of evidence as to degree of psychological limitations); *Hurlbut v. Colvin*, No. 15 CV 50270, 2017 WL 497774, at *3, 2017 U.S. Dist. LEXIS 16822, at *10 (N.D. Ill. Feb. 7, 2017) (remanding so that medical expert could be called to answer several questions about the medical treatment at issue); *Sisul v. Astrue*, No. 4:08-CV-4044, 2009 WL 3672058, at *9–10 (C.D. Ill. Oct. 29, 2009) (holding the ALJ was required to recontact treating physician where

there was no evidence in the record as to claimant's current lifting ability). In some instances, courts have remanded the decisions of ALJs who interpreted medical evidence without the benefit of a medical expert. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003) ("[T]he ALJ seems to have succumbed to the temptation to play doctor when she concluded that a good prognosis for speech and language difficulties was inconsistent with a diagnosis of mental retardation because no expert offered evidence to that effect here . . . Under the circumstances, the ALJ should have summoned an expert to provide an informed basis for determining whether [claimant] is disabled."); *Potega v. Berryhill*, No. 16 CV 50110, 2017 WL 2461549, at *6, 2017 U.S. Dist. LEXIS 87200, at *19 (N.D. Ill. June 7, 2017) (requiring the ALJ to call a medical expert on remand where ALJ played doctor to interpret claimant's fibromyalgia treatment records).

However, when the record is adequate, courts in this Circuit find the ALJ was not required to recontact a treating source or obtain the testimony of a medical expert. *See, e.g.*, *Britt*, 889 F.3d at 427 ("[T]o the extent Britt believes that the ALJ should have re-contacted Dr. Hildreth for an explanation regarding the inconsistencies between her report and those of other doctors, the ALJ was not required to do so because the record contained adequate information for the ALJ to render a decision."); *Mullinax v. Astrue*, No. 1:08-CV-0284TABWTL, 2009 WL 899658, at *4 (S.D. Ind. Mar. 31, 2009) (holding there was ample evidence in the record to determine disability and therefore no need to recontact medical sources where ALJ had the benefit of treatment notes, objective testing, consultative examinations, the opinion of a state agency medical consultant, the opinions of specialists, and the testimony of three medical experts).

Here, the ALJ erred when she failed to recontact Tasha's treating physicians and/or call a medical expert to assist her because the record was inadequate as to Tasha's RFC. As the Court has already discussed, the ALJ mischaracterized the opinions of Tasha's treating physicians as

drawing general opinions about Tasha's ability to work. In reality, none of Tasha's treating physicians seemed to be assessing Tasha's overall ability to work (or what restrictions might be required if she returned to work) when considering her various impairments. Nor did any of Tasha's treating physicians complete a physical RFC questionnaire. In fact, the only doctors who assessed Tasha's ability to work as part of a physical RFC assessment were the state agency medical reviewers, Drs. Gotanco and Bacalla. Unfortunately, those doctors based their opinions on a purely documentary review that was missing years of Tasha's medical records. Dr. Gotanco made his RFC assessment in December 2014, (R. 100), and Dr. Bacalla made her RFC assessment in April 2015. *Id.* at 111. Because Tasha's medical records span to roughly February 2017, Drs. Gotanco and Bacalla's reviews of the medical record were, at best, missing nearly two years of Tasha's treatment records.

The record indicates that the ALJ was originally missing those two years of records as well. In September 2016, at Tasha's first hearing before the ALJ, the ALJ continued the hearing because Tasha's most recent treatment records, covering the 2015 to 2016 timeframe, had yet to be received. (R. 80-83). At that time, the ALJ had a medical expert, Dr. Jilhewar, on standby to help her make a decision as to Tasha's disability. Dr. Jilhewar testified that he could not make a determination without the missing records. *Id.* at 82-83. At Tasha's second hearing in February 2017, despite the introduction of new treatment records, the ALJ declined to call a medical expert to testify. By the time of the ALJ's decision in June 2017, Tasha's medical record included the additional Exhibits 23F through 31F, which comprised nearly 500 pages of additional medical records, spanning roughly from February 2015 to February 2017. *Id.* at 14, 1463-1961. Despite this large influx of medical records in an already extensive medical file, the ALJ did not call back Dr. Jilhewar or seek out the help of another medical expert.

With no medical expert, and no timely physical RFC evaluation by a doctor, the ALJ was left alone to piece together around eight years of medical records, covering treatment from at least eleven physicians, for Tasha's knee, back, neck, and shoulder impairments. In this case, the ALJ's decision indicates that she erred in not seeking the assistance of a doctor when forming Tasha's RFC. This is so for at least two reasons.

First, the ALJ, herself, acknowledged a lack of evidence as to Tasha's RFC when weighing the medical opinions. She specifically declined to give controlling weight to the opinions of treating physicians Piska, Hall, and Sweeney because she could not determine from their decisions "to what degree [Tasha] could return to work or her functional capabilities." (R. 20-21). Second, the ALJ's decision demonstrates that she played doctor to fill in the gaps as to Tasha's functional capabilities. The ALJ's selected RFC only accounts for normal breaks because, according to the ALJ, "although the claimant reports that she requires regular rest breaks throughout the day and is unable to sit or stand without experiencing disabling radiculopathy, testing has shown her with no evidence of radiculopathy to support her allegations." *Id.* at 21. As the Commissioner notes, the ALJ based her radiculopathy opinion on physical therapy records and test results. Doc. [23] at 5. In particular, the ALJ interpreted a physical therapy discharge record from November 2016 as "noting that all of her pain and radicular symptoms had been resolved, contrary to her subjective complaints." (R. 20). The ALJ likewise reads a September 2016 EMG as "more recently [ ] confirm[ing] the claimant sustains no evidence of lumbar radiculopathy plexopathy, or mononeuropathy to support her allegations of radiating back pain." *Id.* In addition, the ALJ made the global statement that "MRI and CT testing on both the cervical and lumbar spine have shown nothing more than mild to moderate degenerative changes in the spine." *Id.* at 19. From these interpretations, the ALJ apparently determined that Tasha can work without extra breaks. *Id.* at 21.

A closer look at the ALJ's cited support illustrates that she undertook this impermissible role of interpreting raw medical evidence. Beginning with the cited MRI and CT testing, which the ALJ claimed showed "nothing more than mild to moderate degenerative changes in the spine," (R. 19-20), the ALJ referred to a November 2016 cervical spine MRI, a November 2015 lumbar spine CT, and a May 2016 lumbar spine CT. *Id.* at 1416-17, 1560-61, 1562. Although the November 2016 cervical spine MRI did have an impression listed as "Mild to moderate degenerative changes of cervical spine," that same scan found Tasha to have "disc osteophyte complex," and "patent . . . [n]eural foramina." *Id.* at 1417. The cited lumbar spine CT scans from November 2015 and May 2016 further indicated, respectively, "Postsurgical changes of anterior fusion with discectomy and disc prosthesis at L5-S1," and "[s]ome degenerative endplate changes . . . at the T11-T12." *Id.* at 1560, 1562. While the Court does not presume to interpret those findings, or reweigh the medical evidence, it does appear that the MRI and CT scans interpreted by the ALJ could indicate more than just "mild to moderate degenerative changes in the spine." *Id.* at 19. Even if all of the objective tests stated simply, "mild to moderate degenerative changes in the spine," no doctor in this case reviewed those scans and translated them into a finding that Tasha could work a full time job with only normal breaks. The ALJ is not qualified to do so.

The September 2016 EMG and November 2016 physical therapy record likewise contain additional findings missed by the ALJ's lay perspective that may have impacted Tasha's ability to work a full work day with normal breaks. For instance, in the EMG's listed assessment with respect to "Low back pain," the document states that there is no "electrodiagnostic evidence of left-sided lumbosacral radiculopathy, plexopathy or mononeuropathy." (R. 1339). However, the EMG also states that "Lumbar claudication remains in the differential diagnosis. We can continue gabapentin." *Id.* Similarly, the cited November 2016 physical therapy discharge record does

contain a note that Tasha's "[p]ain and radicular symptoms were abolished." *Id.* at 1898. Yet, right above the November 2016 discharge entry, there is a January 2017 admission entry indicating Tasha was experiencing cervical spine pain and that she was a "good candidate for PT and should benefit from skilled intervention to address her 'issues' to decrease pain and improve [her quality of life] and independence." *Id.* Again, the Court does not presume to interpret these medical records. Perhaps a doctor reviewing these records could find that the EMG and physical therapy records indicate that Tasha could sustain a normal work day without extra breaks. However, the issue here is that the ALJ, who is not a doctor, cherrypicked a few phrases from technical medical reports and thereby concluded that there was no evidence of radiculopathy,[3] and that Tasha consequently had no need for additional breaks. *Dolan v. Colvin*, No. 15 CV 50185, 2016 WL 6442226, at *4 (N.D. Ill. Nov. 1, 2016) (holding ALJ violated central tenet of disability law and played doctor by drawing conclusions from technical medical evidence without calling a medical expert).

The Commissioner argues that the ALJ had no duty to obtain additional opinions from treating physicians or a medical expert because it was Tasha's duty to provide evidence that she was disabled. Doc. [23] at 8-9. It is certainly true that Tasha had a duty to provide medical records supporting her claim of disability. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."). Nevertheless, that duty does not negate the ALJ's duty to develop the medical record. *See* 20 C.F.R. § 404.1512(d). The Commissioner, moreover, fails to address the Court's other concern here, which is that the ALJ, in the absence of a medical expert, treating

---

[3] The ALJ appears to have missed the February 2017 medical record indicating that Tasha received an epidural steroid injection at the C6/C7 level. (R. 1548). The record lists Tasha's pre- and post-operative diagnosis as cervical radiculopathy. *Id.*

physician, or state agency physician with access to the whole medical record, used her lay opinions to fill evidentiary gaps in the record.

In light of the inadequacy of the record with respect to Tasha's functional capabilities, and because the ALJ improperly assumed the role of a physician, the Court finds that the ALJ erred in not recontacting Tasha's physicians and/or obtaining the testimony of a medical expert in order to craft Tasha's RFC.

### C.      Harmless Error

The Commissioner argues that Tasha has failed to establish any error that supports remand, invoking the harmless error doctrine.  An error is harmless when it is "predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *see McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("Thus, we look at the evidence in the record to see if we can predict with great confidence what the result on remand will be.").  Here, because the Court cannot "say with great confidence" what the result on remand would be, the Court cannot find that the ALJ's errors in weighing the medical evidence and failing to develop the medical record were harmless.

For example, the ALJ's errors led to an RFC that did not accommodate any need for additional breaks.  The Commissioner asserts that, "[t]o the extent that the ALJ erred by failing to give greater weight to the medical opinions in the record, that error was harmless, as those opinions were consistent with the ALJ's RFC determination." Doc. [23] at 9.  The Court disagrees.  As previously discussed, the ALJ's weighing of treating physician Dr. Imlach appears to have missed Dr. Imlach's more recent treatment of Tasha from 2015 to 2016.  Had the ALJ properly assessed the duration and extent of Dr. Imlach's relationship with Tasha, the ALJ might have given more

weight to Dr. Imlach's assessment in September 2015 that Tasha suffered from lumbar radiculopathy and back muscle spasms. (R. 1352). Because the ALJ rejected Tasha's need for additional breaks based on the purported lack of evidence on radiculopathy and back spasms, *see id.* at 21, the Court is not confident that the ALJ would have created an RFC with "normal breaks," had she adequately addressed the regulatory factors with respect to Dr. Imlach. As a result, the treating physician error is not harmless, as the outcome upon remand is not foreordained. At the very least, the ALJ formulated an RFC that did not give weight to Dr. Imlach's more recent opinions. *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (holding ALJ's error in giving little weight to treating physician not harmless where outcome was not foreordained, since at the very least, ALJ formulated RFC without including treating physician's most recent opinions).

The vocational expert's testimony in this case provides further evidence of the harm of the ALJ's errors in this case. At the February 2017 hearing, the ALJ asked the vocational expert whether there would be jobs for an individual that would be off task 15 percent or more in a work day. (R. 71). The vocational expert responded: "No. I don't believe so. I think that once a person is off task especially in unskilled type positions, more than 10 percent of the time, I don't think you could get enough work process done to satisfy most employers. So, there would be no jobs that would remain." *Id.* Thus, the ALJ's RFC determination that Tasha could sustain a job with normal breaks was essential to the ALJ's determination that she was not disabled. Had the ALJ properly weighed the medical evidence, and had she properly recontacted Tasha's physicians or consulted a medical expert to determine Tasha's ability to sustain an eight-hour work day, it is possible that the ALJ's RFC determination would have reflected a need for additional breaks. Such a finding could have impacted the bottom line regarding Tasha's disability.

Because the ALJ's errors in weighing the medical evidence and failing to develop the medical record were harmful in this case, the ALJ's decision is reversed and remanded. The Court further observes that the ALJ failed to assign weight to numerous physicians presented in the medical record. Upon remand, the ALJ should determine whether any of these physicians constitute "Treating source[s]" under 20 C.F.R. § 404.1527(a)(2). For each treating source, the ALJ should explain what weight, if any, she gives to the physician's opinion. If the ALJ gives less than controlling weight to a treating physician's opinion, she must then apply the regulatory checklist factors in explaining her reasoning. Also, for the reasons discussed above, the ALJ needs to either recontact Tasha's treating physicians to obtain a physical RFC assessment, or call a medical expert.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [12] is granted, and the Commissioner's Motion for Summary Judgment [22] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

**SO ORDERED.**

Dated: December 17, 2019

Sunil R. Harjani
United States Magistrate Judge